IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNIÓN DE EMPLEADOS DE MUELLES DE P.R., INC., <br><br> Plaintiff, <br><br> v. <br><br> INT'L LONGSHOREMAN'S ASSOC., AFL-CIO, <br><br> Defendant. | CIV. NO.: 15-1750(FAB/SCC) |

## REPORT AND RECOMMENDATION

This action pits a local labor organization, the Unión de Empleados de Muelles de Puerto Rico, Inc., or UDEM, against an international labor organization, the International Long-shoreman's Association, AFL-CIO ("the ILA"). Docket No. 1. UDEM seeks a preliminary injunction ending the ILA's emergency trusteeship over it, Docket No. 19, while the ILA seeks to strike UDEM as a party to this case, Docket No. 26. Both of these motions have been referred to the undersigned for a report and recommendation, Docket Nos. 21, 28, and a

preliminary injunction hearing was held on September 2–4, 2015.

At the heart of both parties' motions is the question of whether UDEM is affiliated with the ILA, that is, whether it is in fact ILA Local 1901, as it undoubtedly had been from 1961 until May 9, 2015. Believing UDEM to be Local 1901, a local union placed under trusteeship on March 11, 2015, the ILA argues that as a threshold matter UDEM should be struck as a party because the trustee has not authorized this lawsuit. But UDEM argues that it disaffiliated from the ILA prior to the imposition of the trusteeship. The ILA has failed to explain why, if UDEM successfully disaffiliated before it was placed under trusteeship, it could be properly struck as a party.[1] For this reason, ruling on the ILA's motion requires the Court to determine whether or not UDEM disaffiliated from the ILA on

---

**1.** There is caselaw holding that once a local disaffiliates, a trusteeship may nonetheless be used as a mechanism for recovering assets which contractually belong to the international. *E.g.*, *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Olympic Plating Indus., Inc.*, 870 F.2d 1085, 1088 (6th Cir. 1989). But such cases do not suggest that a disaffiliated local would somehow lack standing to challenge a subsequent and wrongful trusteeship imposed to control the business of the disaffiliated local itself. Indeed, such a result would be illogical.

May 9. Accordingly, the motion to strike may not be ruled upon as a threshold matter, and so I proceed directly to the factual findings made as a result of the preliminary injunction hearing. After doing so, I consider the parties' motions and recommend that UDEM's motion for a preliminary injunction be denied. Then, in light of those factual findings, I consider the ILA's motion to strike, finding that UDEM lacks standing to pursue this lawsuit. Finally, I recommend that Banco Popular recognize the ILA-appointed trustee in a related dispute concerning Local 1901's welfare fund.

### 1. Findings of Fact

### 1.1 UDEM and the ILA

UDEM, a corporation organized under the laws of Puerto Rico, was founded in 1938 and early on affiliated with the General Confederation of Workers. UDEM disaffiliated from the General Confederation of Workers in 1960, and in 1961 it affiliated with the ILA, becoming Local 1901. René A. Mercado-Álvarez was a member of Local 1901 for some 20 years, and in 2012 he became its president. Local 1901 has contracts with eleven employers and has 125 members; both of these numbers grew markedly under Mercado's leadership.

The parties agree that the origin of the present dispute was

the closing, in January 2015, of Horizon Lines's stevedoring operations in the Port of San Juan.[2] Horizon Lines had operated out of Terminals E and F, and after its closing the footprint on which it had operated was taken over by a different stevedoring company, Luis Ayala Colón ("Ayala"). Members of ILA Local 1575 had worked for Horizon Lines at Terminals E and F, and they believed that they had a continuing right to work at those Terminals under Ayala, which they considered a successor to Horizon Lines under the Collective Bargaining Agreement. Meanwhile, Local 1901 (along with two other ILA Locals) had a contract with Ayala, which it believed would entitle *its* members to work at Terminals E and F.

When the ILA got wind of this jurisdictional dispute, it called a meeting of Puerto Rico's four ILA Locals: Locals 1901 and 1575, along with Locals 1902 and 1740. This meeting was held on February 17, 2015, and the ILA's representatives took the position that accommodations had to be made such that Local 1575's members would not be put out of work. No agreement could be reached among the Locals, however. The

---

**2.**  According to the testimony of James Paylor, an ILA official, the relationship between the Puerto Rico Locals had been "toxic" for years; this was merely a flare-up in a long-simmering conflict.

next day, the presidents and vice-presidents of the Locals met, *sans* attorneys, with three ILA vice-presidents: James Paylor, John Baker, and Bernard Dudley. Paylor and Dudley had been appointed by the ILA to investigate the dispute.[3] *See* P.'s Exh. 2.

When the February meetings failed, the ILA noticed another meeting, this time in Tampa, for March 18. Paylor, Dudley, and Baker were all at this meeting, as was the ILA's legal counsel. The Puerto Rico Locals all attended with counsel. During this meeting, a temporary work agreement—apparently authored by the ILA—was proposed. The ILA saw this temporary agreement as a stepping stone towards the eventual merger of the four Locals. P.'s Exh. 3. Locals 1740 and 1575 agreed to the proposal, but Locals 1901 and 1902 did not. Days after the Tampa meeting failed to produce results, Harold Daggett, the ILA's president, wrote a letter "direct[ing]" Locals 1901 and 1902 to execute the Tampa agreement or else face "more stringent measures." P.'s Exh. 4.

---

**3.**   According to Mercado, Paylor threatened trusteeship or merger at this early meeting. I do not credit this testimony. I find more credible Paylor's testimony that it would have done little good to threaten, at this early stage, Local 1901 with trusteeship.

Mercado reasonably understood this threat to mean merger, or even trusteeship or cancellation of Local 1901's charter.

On March 30, 2015, the Locals, as well as the employers' Bargaining Committee, agreed to a work-sharing agreement drafted by Mercado. P.'s Exh. 5. After this agreement was ratified, Paylor informed the Locals that to make it work, they would have to receive transfers of unemployed members of Local 1575.[4] Subsequently, Paylor heard from fifteen or twenty Local 1575 members that Local 1901 was refusing to accept these transfers. Meanwhile, on March 31, 2015, Daggett sent another letter to the Puerto Rico Locals, informing them that the ILA was "fully committed to pursuing a merger" between them, which would be overseen by Paylor and Dudley. P.'s Exh. 6.

On April 8, 2015, Paylor notified the Locals of yet another meeting, which would be held on April 14. This time, the leadership of each Local would meet separately with ILA officials. P.'s Exh. 7. During Local 1901's meeting with the ILA

---

**4.** According to Paylor, this was necessary to comply with the first page of the agreement. Nothing in the agreement explicitly requires such transfers, however, and Paylor never explained why they were necessary to implement the agreement.

officials, Paylor told Mercado that the ILA's constitution gave him the authority to merge the Locals, and said that the catalyst for this merger had been the dispute with Local 1575. Mercado asked for details regarding how this merger would be carried out. Paylor told Mercado that he did not have details yet; he was looking for input, because the merger was in its initial stages.[5]

In response to these developments, Mercado called a meeting of Local 1901's executive board. At that meeting, it voted unanimously against the merger and unanimously in favor of disaffiliation from the ILA. P.'s Exh. 8. In spite of this apparent move, when Local 1901 wrote the ILA on April 29 to oppose the merger, it specifically referred to itself as ILA-affiliated. P.'s Exh. 9 ("U.D.E.M. ILA 1901 of Puerto Rico affiliated to ILA"). And rather than note the board's disaffiliation decision, Local 1901 sought remedies under the ILA's constitution with respect to the merger.[6] *Id.* On April 30, 2015,

---

5.   I do not credit Mercado's testimony that Elizabeth Alexander, the ILA's counsel, said that she had such a document but would not give it to Mercado.

6.   I harbor real doubts about whether the Board in fact voted for disaffiliation on April 23, 2015. Among the oddities noted in the above text, the purported minutes for that meeting note that after the

Daggett denied Local 1901's request for a hearing. P.'s Exh. 10.

On May 1, 2015, Paylor circulated a letter to all members of Locals 1575, 1740, 1901, and 1902, explaining why the ILA had decided that merger was the best course for the disparate Locals' memberships.[7] The letter also attempted to disabuse the members of some false rumors Paylor believed had been spread about the negative consequences of a merger—rumors that Paylor believed had been spread principally by Mercado. Then, on May 5, 2015, the ILA informed the Puerto Rico District Council—a group consisting of representatives of all four Locals—that "[i]n light of the recent closure of Horizon Lines," Local 1740's charter would be amended to add several job classifications. P.'s Exh. 11. These were precisely the same classifications as were included in Local 1901's charter, and, although the letter did not specifically mention Local 1901,

---

disaffiliation motion was approved, "the document [was] signed." P.'s Exh. 9. But no document regarding disaffiliation was produced during the hearing. In spite of these doubts, I accept for the purposes of this opinion that the vote happened for the simple reason that, for reasons explained below, such a vote would have had no legal effect.

7.  Paylor testified that he had asked the leadership of the unions to hand out the notice, but dual members of Locals 1740 and 1901 told him later that Local 1901 had failed to comply. Thus, for later all-member notices Paylor sent the letters to individual members' addresses.

Mercado understood it to be a prelude to those classifications being taken away from Local 1901.[8] Notably, Local 1740 had supported the ILA in its disputes with Locals 1901 and 1902 over how to accommodate Local 1575. In response, Mercado wrote a letter to the ILA alleging that changing Local 1740's job classifications in that way would violate the ILA constitution and the Collective Bargaining Agreement. P.'s Exh. 12. Mercado thus requested a hearing, *id.*, which request was denied, P.'s Exh. 13.[9]

On May 8, 2015, Paylor circulated a letter to Local 1901's membership informing them that a meeting would be held on

---

**8.** Indeed, Mercado testified that the ILA constitution prohibited two locals in a single geographical area from having charters with the same classifications. I can find no such clause in the ILA constitution, but it is at least plausible that such a practice was common. If nothing else, Mercado was probably correct in interpreting what the May 5 letter foretold.

**9.** The response to Mercado's hearing request, in particular, shows the at times imperious nature of the ILA's treatment of UDEM. Mercado requested a hearing through a May 7, 2015, letter. P.'s Exh. 12. The ILA's May 8, 2015, response acknowledges that its constitution requires an investigation into "any objection to the issuance of a charter." P.'s Exh. 13. The letter goes on to say that such an investigation had already been conducted and its result was contrary to UDEM. *Id.* Given that just 24 hours had elapsed since the objection had been made, it is hard to believe this "investigation" in any serious way.

May 11, 2015; the letter reiterated some of the information Paylor had included in his May 1 letter and moreover specifically alleged that Mercado had been spreading false information about the merger. D.'s Exh. D. This letter, and the impending meeting, seem to have prompted Mercado to call an emergency membership meeting of Local 1901 on May 9, 2015. According to the minutes of that meeting,[10] a motion was made

> for the Board of Directors to continue making the efforts that it understands pertinent . . . and that every effort be made which is not limited to any action which must be taken to protect [the] Union and for every action taken by the board to be accepted, including the disaffiliation from the ILA.

P.'s Exh. 14. This motion was "[s]econded unanimously," *id.*, and was not carried out by secret ballot. Oddly, a motion was then made to reject the merger, a point which would seem

---

**10.** Apparently the NLRB at some point asked for a copy of the May 9 meetings and Mercado failed to produce them. On cross-examination, Mercado said this was because he didn't have them at the time. The ILA would like the Court to infer that the vote didn't happen and that the minutes are a sham. And, frankly, there is evidence in support of this position. *See, e.g.*, D.'s Exh. E (May 14, 2015, letter from Mercado informing the District Council that, on May 9, the *board of directors* decided to disaffiliate from the ILA). However, it is contradicted by the testimony of one of the ILA's own witnesses, as described *infra* note 11.

moot if the prior vote had disaffiliated UDEM from the ILA.[11] *Id.* In any case, this motion was unanimously approved, and a motion was made and approved to inform the ILA that the Local did not accept the merger—but no motion was made to inform the ILA about the purported disaffiliation. *Id.*

Few members of Local 1901 showed up for the May 11 meeting with Paylor, and those who did were, by and large, individuals that held dual membership with Local 1740. During the meeting, which was held at the Caribe Hilton, Paylor was told that Mercado was at a Subway just off the grounds attempting to dissuade arriving members from attending. Paylor walked out to meet Mercado and told him that if he came inside, he'd be given an opportunity to put his

---

**11.** During the hearing, the ILA proffered that one of its witnesses, Felipe González-Colón, a non-member of Local 1901 that was present at the May 9, 2015, meeting as the administrator of its welfare fund, would testify that no disaffiliation vote was taken at that meeting. On the stand, however, González, who otherwise seems estranged from UDEM and Mercado, testified that a disaffiliation vote *was* taken. The Court was surprised by this testimony, as, apparently, were the ILA's lawyers, whose courtroom reaction was notably frantic. The line of questioning was abruptly cut off at that point, and González was not asked about the outcome of the vote or the specific question posed. The Court is unsure what to make of the disconnect between the ILA's proffer and its evidence, but under the circumstances cannot help but find that some vote related to disaffiliation was taken.

arguments to the membership. Mercado demurred, saying that he wasn't prepared.[12]

Also on May 11, 2015, Mercado sent the ILA letter informing it that Local 1901's members had unanimously voted to disapprove of the merger. P.'s Exh. 15. The letter did not mention disaffiliation. The next day, May 12, at about 4:00 p.m., another letter was sent by Mercado to the ILA stating that UDEM had disaffiliated from the ILA. P.'s Exh. 16. The same day, the ILA sent a letter to Local 1901 informing it that it had been placed under an emergency trusteeship. P.'s Exh. 17. According to Mercado, the trusteeship letter arrived *after* he had sent Daggett the disaffiliation letter; moreover, Mercado testified that he wrote the disaffiliation letter on May 11—hence its dateline—but had not sent it until May 12 because he experienced problems with the fax machine the previous day. Mercado's explanation is not credible. The fax transaction report on top of the letter informing the ILA that Local 1901 had rejected the merger says that it was sent on May 11 at 1:17 p.m. P.'s Exh. 15. This shows that the fax machine was working

---

**12.**  Mercado testified that during this confrontation with Paylor, Mercado informed him of UDEM's disaffiliation from the ILA. Paylor denies being told any such thing, and I credit Paylor's testimony on this point.

on May 11, contrary to Mercado's testimony. Moreover, Mercado has offered—and I can come up with—no convincing explanation for why Mercado would, on the same day, put the news about rejecting the merger and disaffiliating in two letters on different letterhead. I conclude that Mercado sent the disaffiliation letter in response to being informed that Local 1901 was being placed under trusteeship. Indeed, I find that, whether or not the disaffiliation vote was taken, Mercado was prepared to continue operating under the aegis of the ILA so long as he could get his way—this was the purpose of the letter rejecting the merger—but once he found out that trusteeship would be imposed, and that he would lose power, he sent the disaffiliation letter in an attempt to short-circuit the trusteeship.

That Mercado had not settled on disaffiliation is confirmed by his May 14, 2015, letter to Daggett, which, under Local 1901 letterhead, claimed that the imposition of a trusteeship was an "illegal act" but asked the ILA to "go before the corresponding forums" in a reconciliation effort. P.'s Exh. 18. No response to this letter was received, and on May 19, 2015, UDEM—still operating as Local 1901, according to the letterhead of its minutes—held another membership meeting. P.'s Exh. 19.

During this meeting, the membership again voted to "ratify" the Board's previous decision to disaffiliate "immediate[ly]" from the ILA.[13] *Id.*

The ILA held a hearing regarding the trusteeship on June 11, 2015. Mercado and UDEM's vice-president appeared along with their counsel. When their counsel told the committee that he was representing UDEM—and not Local 1901—he was told that unless Mercado was appearing as a member of Local 1901 he had no reason to be there. Mercado went to leave, but he was stopped by a lawyer for the ILA, who convinced him to stay and speak. But Mercado again identified himself as a member of UDEM, rather than Local 1901, and a member of the committee again said that in that case there was nothing to discuss. Mercado left the meeting at that point. That same day, Mercado sent a letter to the ILA official in charge of the

---

**13.** At some point in May 2015, Mercado incorporated an entity with a name near-identical to UDEM: the Unión *Independiente* de Empleados de Muelles de Puerto Rico y El Caribe, Inc. Mercado claims to have terminated this new entity only days after creating it, but *someone* appears to have nonetheless contacted employers on its behalf (and filed for certification before the NLRB) seeking to act as a bargaining agent for units at the time represented by Local 1901. However, these contacts were not discussed in detail during the hearing and so do not enter very much into my analysis.

trusteeship matter disputing the ILA's jurisdiction given UDEM's disaffiliation. D.'s Exh. L.

### 1.2 Other Matters

While the dispute between UDEM, Local 1575, and the ILA was ongoing, several ancillary controversies arose that deserve attention. The first of these concerns the building that had long housed Local 1901, and which was owned by the Local. As of early May 2015, Local 1901 owed some $30,000 on the building. On May 5, 2015—as Local 1901's conflict with the ILA was worsening—Local 1901 made the curious decision to sell the building to its own vice-president, Ramón Rodríguez, for $140,000. According to Mercado, this transaction was done because the union needed money and Rodríguez had money he was looking to invest. But the deal was structured in such a way that it would neither provide Rodríguez with an obvious benefit nor provide any real cash infusion to the struggling Local 1901: the union essentially became Rodríguez's mort-gagee, allowing him to pay $1,000 per month for eleven years; meanwhile, Local 1901 retained the right of possession. Curiouser still, on May 30, after UDEM had purportedly disaffiliated from the ILA, it bought the property back from Rodríguez, according to Mercado because Rodríguez's

economic position had changed. But none of Mercado's explanations make any real sense, and so I'm inclined towards the ILA's explanation for the transaction: that the building's alienation was meant to keep it from the ILA in the case of trusteeship.[14]

Another issue concerns the Local 1901 welfare fund ("the Fund"). This fund, which is an entity separate from UDEM/Local 1901 or the ILA, pays the membership's insurance costs as well as certain other benefits. The Fund is controlled by an equal number of labor and employer trustees, and it is administered by Felipe González. After ILA purported to place Local 1901 under a trusteeship and UDEM purported to disaffiliate, Banco Popular froze the Fund's accounts because it could not determine whether Mercado or John Baker, the ILA's appointed trustee, was empowered to act on labor's behalf with regard to the Fund. Accordingly, the only payments that have been made since June 2015 are those on which the ILA and Mercado can agree. With regard to others—including insurance co-pays and the salary of the Fund administrator—no payments have been made. González has

---

**14.** Notably, UDEM's membership was not notified of the building's sale until after the executive board had decided to sell it.

received fifteen or twenty requests for co-pays and two or three requests for advances on Christmas bonuses, which he has denied but kept the documentation for so that the co-pays, at least, can be reimbursed after this dispute is over.

Relatedly, there is the matter of a check that Mercado drew on the Fund for $20,000 out of his retirement account. According to the testimony of the Fund's trustees and administrator, retirement funds are available only upon retirement unless an emergency justifies their early disbursement. Such an emergency withdrawal requires the consent of the trustees, who will vote on whether to permit it. In this case, however, it appears that no trustee authorized Mercado's withdrawal; worse, he lied to the trustees about having had one of their consents. That said, it does appear that the money in fact came out of money owed to Mercado.

In addition, the Fund has title to a vehicle which Mercado has used and continues to possess. According to Paylor, a Local's welfare fund paying for a car for the Local's president is itself a suspicious arrangement. In this case, moreover, the vehicle is uninsured on account of the freezing of the Fund's bank accounts, and yet Mercado has refused to surrender the vehicle when requested to do so by the trustees. Recently, a

complaint was filed in Puerto Rico court in an attempt to recover the vehicle from Mercado.

Finally, Paylor received information that Mercado had entered into agreements whereby Local 1901's members worked for rates lower than those the ILA considered to be the minimal permissible rates. Paylor also found that Mercado had a "toxic" relationship with Intership, Local 1901's largest employer, that had contributed to an inability to reach a CBA with that employer. D.'s Exh. J. Concomittantly, Mercado had led Local 1901 in what he believed to be unauthorized work stoppages regarding Intership. *Id.*

All of these findings became charges against Mercado in the ILA's trusteeship proceedings. *Id.*; D.'s Exh. K. The charges were sustained, Local 1901 was placed in trusteeship, and Mercado was expelled from the ILA.

### 2.  Analysis

As the party requesting the a preliminary injunction UDEM must show: (1) that in the absence of an injunction it would suffer irreparable harm; (2) that this harm would outweigh any harm that injunctive relief would inflict on the ILA; (3) that it is likely to succeed on the merits; and (4) that granting the injunction would not be against the public interest. *AFL-CIO*

*Laundry & Dry Cleaning Int'l Union v. AFL-CIO Laundry*, 70 F.3d 717, 718 (1st Cir. 1995). Of these factors, the likelihood of success on the merits is the most important. *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

In addition to the substantial burden placed upon it by the preliminary injunction standard, UDEM must also contend with an additional adverse presumption: pursuant to the Labor Management Disclosure and Reporting Act ("the LMDRA"), a trusteeship—including an emergency trusteeship[15]—has a presumption of validity for eighteen months, and a party challenging it must prove by clear and convincing evidence that "was not established or maintained in good faith for a purpose allowable" under the LMDRA. 29 U.S.C. § 464(c); *see also Mason Tenders Dist. Council of Greater N.Y. v. Laborers' Int'l Union of N. Am.*, 884 F. Supp. 823, 832 (S.D.N.Y. 1995) (explaining that a local union seeking a preliminary injunction against a trusteeship faces an especially high burden).

With this background out of the way, I will proceed to

---

**15.** *See, e.g., Int'l Bhd. of Teamsters v. Local Union No. 810*, 19 F.3d 786, 791 (2d Cir. 1994) ("If the [International's] constitution provides for such a procedure, the statutory presumption of validity arises even where a temporary trusteeship is imposed prior to a union hearing."); *see also* Def.'s Exh. A, art. XXI, § 2 (permitting emergency trusteeships).

consider UDEM's motion, paying special attention to its likelihood of success on the merits. I begin with the disaffiliation vote, which I find to have been procedurally deficient. I then turn to the imposition of the trusteeship, which I find to have been properly imposed. Finally, I address whether UDEM should be struck as a party and what should be done with the Fund's bank accounts.

### 2.1 UDEM did not successfully disaffiliate from the ILA.

In *Service Employees International Union, AFL-CIO, CLC v. Local 1199 N.E., SEIU, AFL-CIO, CLC*, the First Circuit upheld an arbitrator's decision that the rights of a local to disaffiliate from an international are controlled by international's constitution, which constitutes a contract between the international and the local. 70 F.3d 647, 651–52 (1st Cir. 1995). In *Local 1199*, this was true even though the constitution in question was "of unlimited duration" and "allowed only a tiny escape hatch." *Id.* Admittedly, *Local 1199*, which applied the limited review due arbitrators' decisions, is not directly on point; nonetheless, its implicit conclusion that locals' rights of disaffiliation are governed by contract comports with the conclusions of many other courts. *See, e.g.*, *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, & Helpers. AFL-CIO v. Local Lodge*

*714*, 845 F.2d 687, 695 (7th Cir. 1988) (concluding that disaffilia-tion is largely a matter of contract); *see also Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, & Helpers, AFL-CIO v. Local Lodge D354*, 897 F.2d 1400, 1407 (7th Cir. 1990) ("[T]he prohibition against disaffiliation found in the Interna-tional's Constitution may be enforceable as a matter of contract law."); *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Local Lodge D504*, 866 F.2d 641, 643 (3d Cir. 1989) (looking to constitution to resolve disaffilation-related dispute); *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Local Lodge D111*, 858 F.2d 1559, 1564 (11th Cir. 1988) ("International's constitution and the merger agreement comprise the contract between the parties here."); *325 Bleecker, Inc. v. Local Union No. 747*, 500 F. Supp. 2d 110, 124 (N.D.N.Y. 2007) ("[A] union's constitution is a contract between labor organizations . . . ."). Following these cases, I also conclude that UDEM's right of disaffiliation is limited by the ILA constitution.

In relevant part, the ILA constitution provides that "no local shall withdraw or be dissolved so long as at least ten (10) members in good standing object to its dissolution at a meeting called to consider the question." Def.'s Exh. A, art. XII, § 4. This

provision thus contains two specific limitations on UDEM's right of disaffiliation: first, it may not do so if ten or more members object; and second, it may do so only after a vote held at a meeting "called to consider the question" of disaffiliation. I read the second of these provisions as requiring that prior notice be given to the membership that a meeting will be held specifically for the purpose of considering disaffiliation; only in this manner, after all, would dissenting members know to show up for the vote.

In this case, however, there is no evidence in the record from which the Court could conclude that prior to the May 9, 2015, meeting, the membership was notified that the meeting was being called to consider disaffiliation. Indeed, Mercado did not testify at all about the manner in which he called the meeting, nor did he mention what he told the membership would be considered. And for other reasons, I would be unlikely to believe Mercado *had* he testified that the meeting was called for the purpose of considering disaffiliation. In particular—even putting my doubts aside about whether the vote occurred at all—Mercado's apparent interest in working simultaneously within and without the ILA suggests to me that, especially given the presence of Local 1740 members in

his membership, he would not have wanted to tip his hand regarding disaffiliation before the vote was taken. Sending out formal notice might have alerted the ILA and brought a quicker imposition of trusteeship; it might also have prevented Mercado from trying to exhaust his internal remedies before breaking with the ILA, as he seemed to want to do even after the May 9 meeting. For these reasons, I conclude that Mercado did not inform the membership before the May 9 meeting that disaffiliation would be considered at that meeting. But as such notice was mandatory under the constitution, this procedural irregularity nullifies the disaffiliation vote.[16]

In addition, I believe there is a real question about whether the vote itself was effective. Rather than vote directly on the question of disaffiliation, as the ILA constitution contemplates, the question presented to the membership was whether to have the Board "continue making the efforts that it under-

---

**16.** A useful point of comparison is the LMDRA's requirement that certain elections—such as those setting rates of dues—be held only "after reasonable notice of the intention to vote upon such question." 29 U.S.C. § 411(a)(3)(A). If such notice is not provided, the membership's vote is deemed not "meaningful." *Morris v. Int'l Bhd. of Locomotive Eng'rs*, 165 F. Supp. 2d 662, 667 (N.D. Ohio 2001). The ILA constitution's notice requirement seems to serve a similar purpose.

stands pertinent as up to the present and that every effort be made . . . to protect [UDEM]" *and* "for every action taken by the Board to be accepted, including the disaffiliation from the ILA." Thus, the question presented multiple discrete issues: both a direction to the Board to "protect" the local *and* a ratification of the Board's prior action, including disaffiliation. In this sense, the question might well have been confusing to the membership.[17] Finally, UDEM's and Mercado's course of conduct after the vote suggests that it was not actually intended as a final act; rather, it seems to have been calculated to provide UDEM with an escape hatch should its continued attempts to negotiate with the ILA regarding the merger fall through.[18]

---

**17.** As its description in the minutes is confusing to me; I had to redact a long phrase from the previous quotation just to make it comprehensible.

**18.** The ILA also relies on cases imposing procedural requireings on disaffiliation votes beyond those found in statute or contract. Most relevant among these is *C.A.P.E. Local Union 1983 v. Int'l Bhd. of Painters & Allied Trades*, where the court held that the ratification by the membership of the executive board's disaffiliation vote was ineffective because, in such circumstances, "the membership is presented with a *fait accompli*." 598 F. Supp. 1056, 1073 (D.N.J. 1984).

I am reluctant to rely on this line of cases. By and large, they or the cases upon which they rely arose in the context of employers' refusal

For these reasons, I find that UDEM did not successfully disaffiliate from the ILA on May 9. I turn next to the propriety of the trusteeship.

## 2.2 UDEM has failed to overcome the trusteeship's presumption of validity.

An international labor organization may place a local under trusteeship only in limited circumstances. These include:

> correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring

---

to bargain with certain locals after putatively-improper affiliation and disaffiliation elections. *See, e.g., Sioux City Foundry Co. v. N.L.R.B.*, 154 F.3d 832, 839 (8th Cir. 1998); *N.L.R.B. v. Bear Archery*, 587 F.2d 812 (6th Cir. 1977); *C.A.P.E. Local 1983*, 598 F. Supp. at 1074 (citing *Bear Archery*). These cases were in turn premised on NLRB holdings requiring certain standards of due process in such elections, even where these requirements were not found in statute or contract. *See N.L.R.B. v. Fin. Inst. Employees of Am., Local 1182*, 475 U.S. 192, 199 (1986) (explaining NLRB holdings). But the Supreme Court called these cases into question in *Local 1182, id.* at 199 n. 6, and the NLRB subsequently abandoned its own precedents in this regard, *Wellington Indus., Inc.*, 357 NLRB 135, at *2 (Dec. 9, 2011). *See, e.g., Garcia v. Sacramento Coca-Cola Bottling Co., Inc.*, 733 F. Supp. 2d 1201, 1210 (E.D. Cal. 2010) (acknowledging the NLRB's more recent precedent); *see also Local Union 13410 v. United Mine Workers of Am.*, 475 F.2d 906, 912 (D.C. Cir. 1973) (refusing to require more procedural safeguards for disaffiliation vote than were required by the union's constitution). I thus have real doubts about whether cases remain good law.

democratic procedures, or otherwise carrying out the legitimate objects of [the international].

29 U.S.C. § 462. In essence, UDEM argues that ILA placed Local 1901 under trusteeship so as to prevent it from disaffiliating. Some courts have held that a trusteeship imposed for this purpose alone is illegal. *E.g., Local Union 13410 v. United Mine Workers of Am.*, 475 F.2d 906, 912 (D.C. Cir. 1973) (holding that trusteeships may not be imposed to prevent disaffiliation). *But see Exec. Bd. Local 1302 v. United Bhd. of Carpenters & Joiners of Am.*, 477 F.2d 612, 614–15 (2d Cir. 1973) (holding that trusteeship to prevent disaffiliation may be appropriate where disaffiliation would undermine collective bargaining). However, even where preventing disaffiliation was *a* purpose of the trusteeship, courts have approved their imposition so long as *another* valid reason supports it. *E.g., Teamsters Local Union No. 2000 v. Hoffa*, 284 F. Supp. 2d 684, 694 (E.D. Mich. 2003).

But I need not decide which of these rules applies for the simple reason that I reject entirely UDEM's argument that trusteeship was imposed to prevent disaffiliation. I reach this conclusion because I have found that, at the time the ILA imposed the trusteeship, it had no knowledge of UDEM's

intent to or attempt at disaffiliation. And without this knowl-edge, the ILA would have had no reason to suspect—or move to impede—disaffiliation.

Instead, I find that the ILA's primary purpose in imposing trusteeship was to neutralize Local 1901's resistance to the proposed merger. It is plain that the ILA saw merger as both a way to strengthen the union's bargaining position in Puerto Rico, to protect Local 1575's members from losing their jobs, and to eliminate the contentious nature of the locals' relation-ships to one another. Thus, as Local 1901 resisted the merger, trusteeship was threatened; when resistance nonetheless continued—and the work-sharing agreement was allegedly violated—trusteeship was imposed.

The problem this creates for UDEM is that it has pointed to no law suggesting that trusteeship for the purpose of merger is disallowed. To the contrary, the ILA's constitution gives to it a unilateral right to merge locals. Def.'s Exh. A, art. XII, § 4 ("The Executive Officers [of the ILA] shall have authority to merge or consolidate two or more locals on such terms and conditions as it deems necessary . . . ."). And nothing I have found suggests that effectuating a merger in accordance with its own constitution would not be a "legitimate object" of a

trusteeship. 29 U.S.C. § 462; *see also Musicians' Protective Union Local No. 274 v. Am. Fed'n of Musicians of U.S. & Canada*, 329 F. Supp. 1226, 1236 (E.D. Penn. 1971) (finding that trusteeship was a proper method of enforcing merger on recalcitrant local); *cf. Local No. 48 v. United Bhd. of Carpenters & Joiners of Am.*, 920 F.2d 1047, 1057 (1st Cir. 1990) (holding that a merger is not a trusteeship).

Moreover, the ILA had several other legitimate reasons for imposing the trusteeship. Mercado's suspicious use of a Fund-owned car, the sale of the union building, and the check drawn on the Fund without proper authorization all created legitimate doubts about how Local 1901 was being run. Similarly, the ILA suspected that Mercado's strained relationship with Intership was hindering Local 1901's efforts to reach a CBA with that important employer, and it likewise suspected that Mercado had been lying to Local 1901's membership to strengthen his position vis-à-vis the ILA. These issues, too, justified the imposition of a trusteeship.

Initially, the trusteeship was imposed on an emergency basis; subsequently, it was validated after a hearing held by the

ILA.[19] By statute, these trusteeships are entitled to a presumption of validity. UDEM has fallen well short of overcoming this presumption; to the contrary, the weight of the evidence suggests that the trusteeship was properly imposed. What this means is that UDEM has essentially no likelihood of success on the merits of its claim. Its preliminary injunction motion should thus be denied for that reason, and there is no need to consider the remaining factors. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of [the preliminary injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").

### 2.3 UDEM must be struck as a party to this case.

The imposition of a trusteeship may be challenged in federal court by "[a]ny member or subordinate body of a labor

---

**19.** To be sure, UDEM did not participate in this hearing because it refused to acknowledge the ILA's jurisdiction. UDEM attempts to put the blame for this on the ILA, but given that UDEM was denying even *being* Local 1901, it is hardly clear what could have been accomplished at the hearing. For this reason, I see no—and UDEM has not seriously argued any—basis for finding that the ILA constitution was not complied with on this point.

organization" affected by its wrongful imposition. 29 U.S.C. § 464(a). Other statutes suggest that by "subordinate body" the statute means, among other things, a local affiliated to an international labor organization. *See, e.g.*, 29 U.S.C. § 402(h) (defining "trusteeship" as a "method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws"); 29 U.S.C. § 462 (providing that trusteeships be imposed "over a subordinate body" only in keeping with the labor organization's constitution and bylaws). Thus, a local labor organization may sue the international regarding the allegedly-improper imposition of a trusteeship. *See, e.g., Wash. Teachers' Union, Local No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38, 51 (D.D.C. 2010) ("The LMDRA provides a cause of action for a local union to challenge a trusteeship that has been imposed on it by a parent union.").

On this basis, UDEM argues that it has standing to sue the ILA as a local harmed by the trusteeship.[20] The ILA responds

---

**20.** Standing is a threshold legal question that can be decided on the basis of a pre-trial evidentiary hearing. *Muñoz-Mendoza v. Pierce*, 711 F.2d 421, 425–26 (1st Cir. 1983). Given that the motion to strike was argued by the parties before and during the preliminary injunction hearing, and given that motion turns on the same facts, I find that the motion to

principally by citing Judge Easterbrook's opinion in *County, Municipal Employees' Supervisors' & Foremen's Union Local 1001 v. Laborers' International Union of North America*, which held that a local put under trusteeship could not sue the international without the trustee's consent. 365 F.3d 576, 578 (7th Cir. 2004). The parties positions on this point can in fact be squared, and in doing so it becomes clear that the ILA has the better of this argument.

Section 464(a) stands for the simple proposition that a local may sue the international regarding trusteeship. What *Local 1001* adds to the equation is a recognition that who speaks for the local is a question decided by the international's constitution, as the contract between the parties. Accordingly, the *Local 1001* court explained that the constitution in that case gave to the trustee "all powers that the local's directors and officers" would normally exercise. 365 F.3d at 578. It was therefore the trustee, and not the local's former counsel, who had the right to speak for the local and decide whether to institute a lawsuit on its behalf. *Id.* at 578–79; *see also Hoffa*, 284 F. Supp. 2d at 699 (holding that after trusteeship imposed, former executive

---

strike can and should be decided on the same record.

officers of the local could not sue on the local's behalf).

*Local 1001* and *Hoffa* have important implications in this case. Pursuant to the ILA constitution, a trustee's powers are set forth in writing at the time of his appointment. Def.'s Exh. A, art. XXI, § 4. Thus, John Baker, when appointed, was "authorized to take control of all books, records, property, assets, funds *and affairs* of Local 1901." P.'s Exh. 17 (emphasis added). At the same time, Local 1901's officers were suspended. *Id.* What this means is that while, under § 464(a), Local 1901 could sue the ILA regarding the trusteeship, it could only do so with the authorization of its trustee, John Baker. Neither Mercado nor anyone else had the authority to initiate suit on Local 1901's behalf. Moreover, to the extent that this suit was brought by UDEM—and *not* Local 1901—it is not even a "subordinate body" of the ILA, and thus likewise lacks standing to sue. *Cf. Commc'ns Workers of Am. v. CWA Local 3010*, 594 F. Supp. 2d 187, 188 (D.P.R. 2009) (Besosa, J.) (holding that while § 185(a) permits locals (and their members) to sue the international, and vice-versa, the trustee did not have standing to sue the local).

UDEM tries to get around this problem by invoking § 185(a)'s separate grant of jurisdiction over contract disputes

between labor organizations. The initial problem with this argument is that it would not provide the court with jurisdiction over the claims that the ILA violated § 462, because those violations would be of statutory—not contract—rights. 29 U.S.C. § 185(a) (referring to "[s]uits for violation of contracts"); *see also Local Lodge 714*, 845 F.2d at 691 (holding that § 185(a) provides jurisdiction regarding "contract remed[ies]"); *CWA Local 3010*, 594 F. Supp. 2d at 188. More importantly, however, given UDEM's affiliation with the ILA and the validity of the ILA's trusteeship over Local 1901/UDEM, there is no reason whatsoever to believe that UDEM has a right to sue the ILA without the trustee's permission in circumstances where Local 1901 would not have that right.

### 2.4 Banco Popular should administer the welfare fund as requested by Local 1901's trustee.

When a conflict arose between the ILA and Mercado as to who had the authority to appoint labor trustees to the Fund, Banco Popular froze several of the Fund's accounts because it had no way of determining who rightfully controlled them. In addition to a state-court lawsuit, Banco Popular also initiated an interpleader action naming as defendants UDEM, the ILA, and the Fund itself. That action was consolidated with this

case, Docket No. 39, and Banco Popular participated in the preliminary injunction hearing held before the undersigned. In terms of relief, Banco Popular asked only for an order from the Court telling it what to do with the Fund's accounts.

As explained above, the trusteeship over Local 1901 is entitled to a presumption of validity. At a minimum, such a presumption must give the trustee the powers necessary to run Local 1901's day-to-day business. Part of this business is appointing trustees to the Fund so that it may carry out its business of insuring and paying benefits to Local 1901's members. Consistent with the presumptive validity of the trusteeship, then, Banco Popular should understand Local 1901's trustee, John Baker, to be the person empowered to appoint labor trustees to the Fund and to otherwise carry out Local 1901's business with the Fund.

### 3.  Conclusion

For all of the reasons explained above, I RECOMMEND that UDEM's motion for a preliminary injunction, Docket No. 19, be DENIED. Because UDEM lacks standing to pursue this case, I further RECOMMEND that the ILA's motion to strike UDEM as a party, Docket No. 26, be GRANTED. As UDEM is the sole plaintiff in this case, I thus RECOMMEND that the

case be DISMISSED. Finally, I RECOMMEND that the Court ORDER Banco Popular acknowledge the presumptive validity of the ILA's trusteeship over Local 1901.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 18th day of September, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE